IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Annmarie Serem, | ) | C/A No.: 1:13-2705-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.     Relevant Background

     A. Procedural History

On October 13, 2010, Plaintiff filed an application for DIB in which she alleged her disability began on November 8, 2008. Tr. at 72. Her application was denied initially and upon reconsideration. Tr. at 87–88, 94. On May 23, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Augustus Martin. Tr. at 44–71 (Hr'g

Tr.). The ALJ issued an unfavorable decision on June 14, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 22–35. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 3, 2013. [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 41 years old at the time of the hearing. Tr. at 46. She obtained a high school equivalency certificate and completed a certificate program through a technical college to become a medical administrative assistant. Tr. at 49. Her past relevant work ("PRW") was as a receptionist, a cashier, and a medical assistant. Tr. at 68. She alleges she has been unable to work since November 8, 2008. Tr. at 46.

2.    Medical History

On March 20, 2008, Plaintiff presented to Jennifer P. Martin, M.D., for consultation and evaluation of low back pain. Tr. at 285. Plaintiff complained of pain in her bilateral and central low back. *Id.* Plaintiff denied radiating pain, numbness, and tingling. *Id.* Plaintiff's weight was noted to be 220 pounds. *Id.* Plaintiff's gait was unassisted and nonantalgic. *Id.* Seating straight-leg raise was negative. *Id.* Plaintiff's strength was 5/5 and symmetric in the bilateral lower extremities. *Id.* Plaintiff had no foot drop, but she did have tenderness to palpation over the lumbar spine and paraspinals

2

from L4 through S1.  *Id.*  She complained of pain with flexion and extension.  *Id.*
Sensation to light touch was intact in her bilateral lower extremities.  *Id.*

MRI of Plaintiff's lumbar spine on March 31, 2008, revealed mild retrolisthesis at
L5-S1, with mild diffuse disc bulging and small central disc protrusion; mild diffuse disc
bulging at L4-5, with small central disc protrusion; and mild diffuse disc bulging at L2-3,
with small left lateral disc protrusion.  Tr. at 286.

Plaintiff followed up with Dr. Martin on April 9, 2008, for low back pain.  Dr.
Martin prescribed medication and noted that Plaintiff would attend physical therapy with
aquatic therapy.  *Id.*  She discussed with Plaintiff the possibility of an epidural steroid
injection if Plaintiff's pain did not respond to conservative treatment.  *Id.*

On September 11, 2008, Plaintiff presented to Lensgraf Clinic complaining of
worsening low back pain.  Tr. at 277.  Plaintiff complained of increased symptoms over
the previous two weeks, with pain radiating into her bilateral hips and gluteals.  *Id.*  She
complained of difficulty with walking and in performing daily activities.  *Id.*

Plaintiff followed up with Ed Roland, NP, at Lensgraf Clinic on September 15,
2008.  Tr. at 275.  Mr. Roland noted palpable tenderness to Plaintiff's lumbar spine and
SI joints.  *Id.*  Her range of motion was decreased bilaterally on lateral flexion, flexion,
and extension of her lumbar spine.  *Id.*  She complained of severe pain with movement on
all ranges of motion.  *Id.*  Plaintiff was prescribed a LSO contour rap back brace and was
scheduled for bilateral facet injections.  *Id.*

On September 18, 2008, Plaintiff underwent diagnostic medial branch block under fluoroscopic guidance; lumbar medial branch blocks at three levels; and attended electrical stimulation.  Tr. at 267.

On September 24, 2008, Plaintiff followed up with Mr. Roland and complained of increased low back pain following a facet joint injection.  Tr. at 263.  Plaintiff's gait was noted to be smooth, and her balance was normal.  *Id.*  She had full range of motion of her lumbar spine with some grimacing on extension.  *Id.*  She had tenderness bilaterally at L4, L5, S1 and in the left greater than right piriformis/gluteus minimus muscle groups. *Id.*

On October 14, 2008, Plaintiff reported to Mr. Roland that her symptoms had decreased and that she had been able to increase her activities.  Tr. at 264.

Plaintiff completed a treatment plan for low back pain on October 16, 2008.  Tr. at 271.  Mr. Roland noted mild palpable tenderness and spasm of Plaintiff's lumbar spine. *Id.*  Plaintiff's range of motion was improved on flexion, but was decreased on left and right lateral flexion.  *Id.*  She complained of mild pain with movement.  *Id.*

On January 13, 2009, Plaintiff received an interlaminar L5-S1 lumbosacral epidural steroid injection.  Tr. at 281–82.

On April 14, 2009, Plaintiff presented to Trident Medical Center and on April 16, 2009, Plaintiff presented to MUSC with bilateral lower extremity joint pain.  Tr. at 302, 380.

Plaintiff presented to J. Edward Nolan, M.D., on April 21, 2009, complaining of low back and leg pain.  Tr. at 310.  Dr. Nolan administered facet joint injections.  *Id.*

Plaintiff followed up with Dr. Nolan on May 8, 2009, for low back pain. Tr. at 313. She reported good relief from the last injections and a desire to receive another injection. *Id.* Dr. Nolan administered a sacroiliac ("SI") joint injection. *Id.*

On May 28, 2009, Dr. Nolan administered bilateral facet lumbar injections. Tr. at 316.

On June 5, 2009, Kristen R. Giet, PA-C, noted moderate pain in Plaintiff's entire bilateral lumbar paraspinous musculature in a bandlike distribution with extension and rotation of the spine. Tr. at 321.

Dr. Nolan administered another L5-S1 lumbar epidural steroid injection on June 12, 2009. Tr. at 322. Dr. Nolan observed moderate pain in a bandlike distribution on Plaintiff's entire bilateral lumbar paraspinous musculature with extension and rotation of her spine. Tr. at 324.

On June 17, 2009, Plaintiff presented to Summerville Behavioral Health for assessment regarding depression, tearfulness, decreased energy, withdrawal, decreased motivation, guilt/grief, history of sexual abuse/assault, alcohol abuse, sleep disturbance, and hopelessness. Tr. at 437. Rhonda Burke, LPC, NCC, assessed a GAF score[1] of 55 and referred Plaintiff to a staff psychiatrist for medication evaluation. *Id.*

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

Plaintiff presented to Ms. Burke on July 1, 2009, and reported improved mood, decreased anxiety, increased energy and motivation, and decreased guilt. Tr. at 436. Ms. Burke indicated that Plaintiff was struggling with the death of her mother and her son's move. *Id.* She assessed a GAF score of 55–60. *Id.*

Ms. Giet again noted moderate pain in Plaintiff's entire bilateral lumbar paraspinal musculature in a bandlike distribution on July 27, 2009. Tr. at 326. She prescribed Mobic and Flexeril and increased Plaintiff's Lortab dosage. Tr. 325.

On August 10, 2009, Ms. Giet prescribed Neurontin. Tr. at 325.

On September 15, 2009, Plaintiff presented to Ms. Giet with complaint of SI joint pain. Tr. at 329. Ms. Giet noted minimal pain in a bandlike distribution in Plaintiff's entire bilateral lumbar paraspinous musculature; moderate pain in the left sacroiliac joint with pelvic compression and to palpation; moderate pain in the left piriformis muscle over the sciatic nerve to palpation; moderate pain in the left greater trochanteric bursa to palpation and with range of motion; and moderate pain in the left posterior femoral cutaneous nerve distribution to the knee. Tr. at 330. Ms. Giet scheduled Plaintiff for SI joint injection with Dr. Nolan. Tr. at 329.

Dr. Nolan administered a SI joint injection and sciatic nerve block and a greater trochanteric bursa injection on September 17, 2009. Tr. at 331.

On October 23, 2009, Plaintiff complained to Ms. Giet that she was not getting adequate relief with Lortab. Tr. at 334. Ms. Giet prescribed Percocet and increased Plaintiff's dosage of Neurontin. *Id.*

6

Plaintiff followed up with Ms. Giet on November 20, 2009, and reported that she was doing well with Percocet and Neurontin.  Tr. at 336.

On March 11, 2010, Dr. Nolan administered bilateral facet lumbar injections at Plaintiff's L3-4, L4-5 and L5-S1 levels.  Tr. at 340.  Dr. Nolan observed that deep tendon reflexes were intact in Plaintiff's bilateral lower extremities; that sensation was grossly intact; that coordination was normal; that muscle strength was grossly intact in her bilateral lower extremities; that muscle tone was normal; and that her gait was antalgic.  Tr. at 342.  On physical examination, Plaintiff had moderate pain in the bilateral lumbar paraspinous musculature in a bandlike distribution with extension and rotation of the spine with tenderness to palpation overlying the facet joints; moderate pain on the left of the sacroiliac joints with pelvic compression and to palpation; and moderate pain in the left lateral femoral cutaneous nerve distribution to the knee.  *Id.*

On March 26, 2010, Plaintiff indicated that her low back was the area with the greatest pain.  Tr. at 343.  Dr. Nolan administered bilateral L4-5 and L5-S1 transforaminal steroid injections.  *Id.*  Dr. Nolan noted that sensation was grossly intact in Plaintiff's bilateral lower extremities; motor coordination was normal; muscle strength was grossly intact in Plaintiff's bilateral lower extremities; muscle tone was normal; and gait was antalgic.  Tr. at 344.  Dr. Nolan observed moderate pain in Plaintiff's bilateral lumbar paraspinous musculature in a bandlike distribution with extension and rotation of the spine with tenderness to palpation overlying the facet joints; mild pain on the left SI joint with pelvic compression and to palpation; and mild pain in the left lateral femoral cutaneous nerve distribution to the knee.  Tr. at 344–45.

Plaintiff presented to Leonard E. Forrest, M.D., on April 20, 2010. Tr. at 288–90. Plaintiff complained of burning, aching, and stabbing low back pain, which was exacerbated by standing or sitting for an extended period of time. Tr. at 288. Plaintiff weighed 250 pounds. *Id.* Dr. Forrest noted tenderness to palpation over Plaintiff's low back and buttocks. *Id.* Dr. Forrest indicated that he did not find any definite neurologic deficit, but that Plaintiff's reflexes were difficult to obtain. Tr. at 289. He noted that Plaintiff could not heel-walk or toe-walk well. *Id.* Dr. Forrest indicated that he reviewed Plaintiff's September 2008 MRI and that Plaintiff's symptoms were inconsistent with the findings on that MRI. *Id.* Dr. Forrest recommended an updated MRI of the lumbar spine and a MRI of the pelvis and sacrum. *Id.* He also recommended EMG and nerve conduction studies of Plaintiff's bilateral lower extremities. *Id.*

MRI of Plaintiff's lumbar spine on April 21, 2010, demonstrated mild multilevel lumbar spondylosis with potential root compression noted at L4-5 and L5-S1. Tr. at 295.

Plaintiff presented to Dr. Forrest's office for EMG and nerve conduction studies on April 28, 2010, but they were unable to proceed with the scans because Plaintiff had twisted her ankle and was experiencing swelling in the area. Tr. at 291. Dr. Forrest indicated that the MRI of Plaintiff's pelvis and hips was normal and that the MRI of Plaintiff's lumbar spine showed a disc herniation with a small free fragment behind the L5 vertebral body, central protrusion at L5-S1, and degenerative changes at several levels. *Id.* He indicated that the disc herniation at L4-5 was likely the cause of Plaintiff's symptoms and was either radiculitis or radiculopathy. *Id.*

On May 6, 2010, Plaintiff presented to Chad R. Burgoyne, M.D., complaining of a long history of recurrent left ankle sprains.  Tr. at 299.  Dr. Burgoyne noted positive swelling at the lateral aspect of Plaintiff's left ankle with tenderness to palpation.  *Id.* Range of motion was decreased to five degrees of dorsiflexion, 35 degrees of plantar flexion, five degrees of inversion, and three degrees of eversion.  *Id.*

Plaintiff underwent EMG and nerve conduction studies on June 30, 2010, which indicated no radiculopathy, plexopathy, or neuropathy.  Tr. at 292.  Plaintiff reported recent improvement in symptoms.  *Id.*  Dr. Forrest indicated that no treatment was required at that time and he recommended that Plaintiff decrease her medications.  *Id.* Plaintiff was instructed to follow up if her symptoms increased.  *Id.*

On August 17, 2010, Plaintiff presented to Ms. Giet for pain management follow up.  Tr. at 346.  Ms. Giet noted mild to moderate pain in Plaintiff's bilateral lumbar paraspinous musculature in a bandlike distribution with extension and rotation of the spine; tenderness to palpation overlying the facet joints; and moderate left ankle pain and intermittent edema.  Tr. at 347.

MRI of Plaintiff's left ankle on August 25, 2010, indicated extensive areas of osteonecrosis within the tarsal bones as well as the distal tibia.  Tr. at 300.  At the ankle joint, there was a small osteochondral lesion.  *Id.*  There was a probable prior subchondral collapse at the tibial plafond.  *Id.*  Posterior tibial tendinopathy was also noted.  *Id.*

MRI of Plaintiff's left foot on August 25, 2010, indicated extensive areas of osteonecrosis throughout a majority of the tarsal bones and also involving the second metatarsal head without evidence of fragmentation.  Tr. at 301.

Plaintiff followed up with Dr. Burgoyne on August 30, 2010, complaining of increased pain in her left ankle.  Tr. at 298.  Dr. Burgoyne noted positive tenderness to palpation of the medial and lateral gutters of Plaintiff's left ankle.  *Id.*  Range of motion was decreased to five degrees of dorsiflexion, 35 degrees of plantar flexion, five degrees of inversion, and three degrees of eversion.  *Id.*  After reviewing the MRI findings, Dr. Burgoyne indicated that the osteonecrosis was not affecting the joints at that time, but he noted some suspicion that the tibial osteonecrosis could have some effect on the ankle joint function.  Tr. at 297.  Dr. Burgoyne indicated that Plaintiff's symptoms were due to the osteochondral lesion, which should continue to heal.  *Id.*

On October 6, 2010, Dr. Nolan administered bilateral transforaminal steroid injections at L4-5 and L5-S1.  Tr. at 348.

On October 20, 2010, Plaintiff presented to Dr. Deberry with hypothyroidism, worsening depression, and worsening low back pain.  Tr. at 365.  Dr. Deberry noted tenderness and spasm in Plaintiff's lumbosacral paraspinals and tenderness along the sacroiliac border.  Tr. at 366.

Plaintiff followed up with Dr. Deberry on November 3, 2010, for worsening back pain, ankle pain, and depression.  Tr. at 363.  She was noted to be "crying" and "in pain." *Id.*  Dr. Deberry observed tenderness and spasm of Plaintiff's lumbosacral paraspinals and tenderness along the sacroiliac border.  Tr. at 364.

X-ray of Plaintiff's left ankle on November 5, 2010, indicated a small area of aseptic necrosis of the talus, which was likely an old chip fracture of the tip of the medial malleolus.  Tr. at 372.

Plaintiff visited Langdon A. Hartsock, M.D., for initial consultation regarding chronic left ankle pain on November 12, 2010. Tr. at 305–06. He noted that Plaintiff weighed 280 pounds and that she was five feet, seven inches tall. Tr. at 305. He noted that Plaintiff had no swelling, deformity, or crepitation in the left ankle. *Id.* She had normal range of motion. *Id.* She did have tenderness to palpation over the anterior talofibular ligament area. *Id.* Her foot was warm and she had normal sensation. *Id.* Dr. Hartsock indicated to Plaintiff that he would review her most recent MRI and contact her. Tr. at 305–06.

Plaintiff followed up with Dr. Deberry on November 17, 2010, regarding degenerative disc disease, depression, and derangement of the ankle and foot joint. Tr. at 361. Dr. Deberry noted tenderness and spasm of Plaintiff's lumbosacral paraspinals and tenderness to the sacroiliac border. Tr. at 362. Depression, unspecified derangement of ankle and foot joint, and degenerative disc disease were all indicated to be "unstable." *Id.*

On December 3, 2010, Dr. Hartsock spoke with Plaintiff over the telephone regarding her MRI findings. Tr. at 304. He indicated that Plaintiff's x-rays and MRI were "fairly unremarkable" and that there was not "really any active treatment that is going to substantially help her." *Id.* He indicated that she could "wear a good supportive shoe or boot and use a cane." *Id.*

Plaintiff followed up with Ms. Giet on December 9, 2010, for low back pain. Tr. at 351. Ms. Giet discontinued prescribing Percocet and indicated that Plaintiff's primary care physician would be prescribing her medications. *Id.* Ms. Giet administered a SI joint injection. *Id.*

On December 16, 2010, Plaintiff followed up with Dr. Deberry regarding depression and degenerative disc disease. Tr. at 359. Plaintiff's weight was noted to be 295 pounds. *Id.* Dr. Deberry observed tenderness and spasm in Plaintiff's lumbosacral paraspinals and tenderness in the sacroiliac border. Tr. at 360. Depression and degenerative disc disease were noted to be stable. *Id.*

On February 14, 2011, Plaintiff complained to Dr. Deberry of recent onset of right ankle pain. Tr. at 453. Dr. Deberry noted that Plaintiff moved slowly and that her right ankle was swelling, tender to palpation, and demonstrated decreased range of motion. Tr. at 454. She referred Plaintiff for MRI. *Id.*

MRI of Plaintiff's right ankle on February 18, 2011, indicated a nondisplaced stress fracture of the medial malleolus and of the posterior aspect of the distal tibial physeal scar, which was partially obscured by an adjacent area of avascular necrosis. Tr. at 399. The MRI further indicated multiple prominent areas of avascular necrosis in the distal tibia, talus, and calcaneus and mild tenosynovitis of both the peroneus longus and brevis tendons from the fibular groove to the base of the foot. *Id.*

On February 23, 2011, Dr. Deberry completed a medical source statement in which she indicated that Plaintiff had a diagnosis of depression, but that she had no work-related limitation in function due to the mental condition. Tr. at 403.

Plaintiff followed up with Dr. Hartsock on March 15, 2011, regarding right ankle and foot pain. Tr. at 418. On examination, Dr. Hartsock noted that Plaintiff had full range of motion of the right ankle, subtalar joint, midfoot, and forefoot without pain. *Id.* He observed mild tenderness to palpation over the sinus tarsi. *Id.* Plaintiff's right foot

12

demonstrated no crepitation or deformity; normal strength; normal sensation; brisk capillary refill; warmth; and negative anterior drawer. *Id.* Dr. Hartsock observed tenderness over the medial malleolus, but there was no tenderness along the peroneal tendons. *Id.* Dr. Hartsock recommended that Plaintiff use an ankle support orthosis and perform activities and weightbearing as tolerated. *Id.* Plaintiff inquired about surgical intervention and Dr. Hartsock indicated that Plaintiff did not have ankle arthritis and that no surgical procedures were indicated at that time. *Id.*

State agency consultant Camilla Tezza, Ph.D., completed a psychiatric review technique on March 4, 2011, in which she indicated that she considered affective disorders, found that depression was an impairment, and determined that Plaintiff had only mild functional limitations as a result of her impairment. Tr. at 404–14.

Plaintiff followed up with Dr. Deberry on March 23, 2011, regarding degenerative disc disease, worsening ankle pain, and improving depression. Tr. at 451–52.

State agency consultant Mary Lang, M.D., completed a physical residual functional capacity assessment on March 23, 2011, in which she indicated that Plaintiff was restricted as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for four hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull limited in lower extremities to occasional use of left lower extremity foot controls; occasionally climbing ramp/stairs/ladder/rope/scaffolds; balancing; stooping; kneeling; crouching; and crawling; and avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, poor ventilation, etc. Tr. at 422–29.

Plaintiff received bilateral transforaminal steroid injections at S1 and at the SI joint on March 25, 2011. Tr. at 430–31. Dr. Nolan indicated that Plaintiff's examination was normal except for mild pain in the lower bilateral paraspinous musculature in a bandlike distribution with extension and rotation of the spine; tenderness to palpation overlying the L4-5 and L5-S1 facet joints, mild to moderate bilateral pain to the SI joint with pelvic compression and palpation; and moderate lumbar radiculitis pain with range of motion in the bilateral S1 nerve distribution into the buttocks. Tr. at 432.

On May 19, 2011, Plaintiff presented to Ms. Burke regarding recurrent depression and alcohol abuse, which was noted to be "in remission." Tr. at 435. Ms. Burke indicated that Plaintiff was tearful, depressed, irritable, and hopeless. *Id.* Ms. Burke indicated that Plaintiff had a GAF score of 50. *Id.*

Plaintiff presented to Dr. Deberry on May 20, 2011, with complaints of increased depression and difficulty breathing. Tr. at 449. She weighed 297 pounds. *Id.* Dr. Deberry noted that Plaintiff was moving slowly and that her right ankle was swollen, had decreased motion, and was tender to palpation. Tr. at 449–50.

State agency consultant Holly Hadley, Psy. D., completed a psychiatric review technique on August 9, 2011, in which she indicated that she considered affective disorders; that Plaintiff experienced depression; and that Plaintiff's resulting functional limitations were mild. Tr. at 473–85.

On August 29, 2011, Jean Smolka, M.D., completed a physical residual functional capacity assessment in which she assessed the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with

14

normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull with lower extremities limited to frequent; occasionally climbing ramp/stairs, balancing, stooping kneeling, crouching, and crawling; never climbing ladder/rope/scaffolds; avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and avoid all exposure to hazards (machinery, heights, etc.).  Tr. at 487–94.

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

            a.    Plaintiff's Testimony

At the hearing on May 23, 2012, Plaintiff testified that she lived with a friend in a two-story home.  Tr. at 47.  She indicated that she did not do laundry and that she tried to avoid driving because of the side effects of her medications.  Tr. at 48.

Plaintiff testified that she obtained a GED and completed a certificate program to become a medical administrative assistant.  Tr. at 49.

Plaintiff testified that she was five feet, seven inches tall and that she weighed 325 pounds.  *Id.*  Plaintiff testified that she gained approximately 100 pounds over a two year period because of her "inability to move too much."  *Id.*  She indicated that she was right handed.  *Id.*  She testified that she owned both a cane and a walker, but that she did not use them because they did not help her.  *Id.*

Plaintiff testified that she worked as a receptionist, a medical assistant, and a cashier within the prior 15-year period.  Tr. at 50.

Plaintiff testified that she could not work because of osteonecrosis in her knees and ankles, which caused daily pain when bearing weight.  Tr. at 52.  Plaintiff testified that she could not sit in the same position for very long.  *Id.*  She indicated that she could walk for no more than 15 to 20 minutes before experiencing numbness in her left leg and a burning, fiery pain in her back.  Tr. at 52–53.  Plaintiff testified that she had herniated discs and degenerative disc disease in her back that caused constant pain.  Tr. at 53.  She testified that she sat in her recliner to elevate her legs.  *Id.*

Plaintiff testified that she was unable to walk down her stairs when her pain was at its worst and that she would, instead, scoot down the stairs one-by-one.  Tr. at 54.  Plaintiff indicated that walking was painful and that bearing weight caused her feet to swell and pound because of the inflammation.  *Id.*  Plaintiff testified that she elevated her foot and placed ice on it.  Tr. at 54.  Plaintiff testified that she wore a brace on her knee when she left her home because she was afraid that her knee would collapse.  *Id.*  Plaintiff testified that her pain was worsened by walking and standing and that it was improved with sitting and elevating her legs.  *Id.*

Plaintiff testified that she took medications and obtained injections in her back about four times per year.  Tr. at 55.  Plaintiff indicated that her breathing was worsened by climbing stairs and that she used her inhaler at least four times per day.  *Id.*  Plaintiff testified that side effects of her medications included dizziness and sleepiness.  Tr. at 56.

Plaintiff testified that she experienced depression.  *Id.*  She indicated that she took two medications for depression and that her depression had worsened over the prior year.

16

*Id.* Plaintiff testified that she cried and was "very miserable." Tr. at 57. Plaintiff indicated that she had a counselor, but that she had not seen her in quite a while. *Id.*

Plaintiff testified that she spent most of her day sitting in her recliner and watching television. Tr. at 58–59. She indicated that she heated frozen meals in the microwave or the oven. Tr. at 59. She testified that she napped on the couch for one to two hours during the day. *Id.* Plaintiff testified that she typically watched 14 hours of television daily. Tr. at 60.

Plaintiff testified that she had difficulty sleeping at night because of pain and discomfort. *Id.*

Plaintiff testified that she shopped, but for only 15 to 20 minutes at a time. Tr. at 61. Plaintiff indicated that she read mysteries. Tr. at 61–62. Plaintiff testified that she had a friend who came by once a week to watch television with her. Tr. at 62. Plaintiff testified that she was a member of a church, but that she had not attended services in about eight to nine months. *Id.*

Plaintiff testified that her doctors had suggested she exercise in a pool because it would be best for her joints. Tr. at 63.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Susan Grant reviewed the record and testified at the hearing. Tr. at 67–70. The VE categorized Plaintiff's PRW as a receptionist, Dictionary of Occupational Titles ("DOT") number 237.367-038, as sedentary with a specific vocational preparation ("SVP") of 4; a cashier, DOT number 211.462-010, as light with a SVP of 2; and a medical assistant, DOT number 079.362-010, as light with a SVP of 6.

Tr. at 68. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work except the individual could stand and walk only two hours in an eight hour day; could occasionally use the left lower extremity for foot controls; could not climb ladders, ropes, or scaffolds; could occasionally perform all other postural movements; and must avoid concentrated exposure to extreme temperatures and respiratory irritants and all exposure to hazards. Tr. at 69. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a receptionist. *Id.* The ALJ asked the VE to further assume that the individual was limited to doing no more than simple, routine, repetitive tasks. *Id.* The VE identified jobs that included addresser, DOT number 209.587-010, which was sedentary with a SVP of 2, with 27,782 positions in the national economy; election clerk, DOT number 205.367-030, which was sedentary with a SVP of 2, with 15,034 positions in the national economy; and telephone quotation clerk, DOT number 237.367-046, which was sedentary with a SVP of 2, with 36,984 positions in the national economy. Tr. at 69–70. The ALJ then asked the VE to further assume that the individual would have to lie down for two to four hours a day. Tr. at 70. The ALJ asked if there would be any jobs that the hypothetical individual could perform. *Id.* The VE testified that there would be no jobs. *Id.*

Plaintiff's attorney declined to question the VE. *Id.*

### 2.    The ALJ's Findings

In his decision dated June 14, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2011.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 8, 2008 through her date last insured of December 31, 2011 (20 C.F.R. § 404.1571 *et. seq.*).

3.    Through the date last insured, the claimant had the following severe impairments:  back disorders; osteoarthritis of the ankles and right knee; asthma; and obesity (20 C.F.R. § 494,1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526)..

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can stand and walk only two hours in an eight hour work day; can occasionally use the left lower extremity for foot controls; cannot climb ladders, ropes, or scaffolds; can occasionally perform the other postural movements; and must avoid concentrated exposure to extreme temperatures and respiratory irritants and all exposure to hazards.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a dental receptionist.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from November 8, 2008, the alleged onset date, through December 31, 2011, the date last insured (20 C.F.R. § 404.1520(f)).

Tr. at 27–35.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ failed to properly evaluate Plaintiff's subjective symptoms;

2)    The ALJ found that osteonecrosis of the left foot, avascular necrosis of the right ankle, and depression were not severe impairments;

3)    The ALJ failed to consider the effects of Plaintiff's obesity; and

4)     The ALJ failed to consider Plaintiff's PRW in accordance with Social Security Ruling 82-62.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the

_____

impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the

22

court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

        1.    Subjective Symptoms

Plaintiff argues that the ALJ failed to properly consider Plaintiff's subjective symptoms based on the evaluation criteria set forth in SSR 96-7p. [Entry # 16 at 9]. Plaintiff argues that the ALJ rejected her allegations of disabling pain without considering her persistent reports of pain to her treating physicians, her abnormal objective test findings, and other clinical abnormalities documented in the record. [Entry #16 at 10–11]. Plaintiff also indicates that the ALJ based his decision to find Plaintiff disabled on her treatment, but that the record reflects that Plaintiff obtained all of the treatment that her physicians advised. [Entry #16 at 11]. Plaintiff argues that the ALJ mischaracterized her testimony regarding her activities of daily living. *Id.* Finally, Plaintiff argues that the ALJ failed to consider non-medical factors that affected her ability to work. [Entry #16 at 11–12].

The Commissioner argues that the ALJ considered Plaintiff's complaints of pain and subjective symptoms, but concluded that Plaintiff's statement were not fully credible based on a review of the record. [Entry #17 at 15]. The Commissioner indicates that the

ALJ determined that Plaintiff's allegations of pain were inconsistent with her daily activities, with objective findings, and with Plaintiff's treatment history. [Entry #17 at 15–17].

SSR 96-7p provides the following guidance to ALJs tasked with assessing the credibility of claimants' statements:

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of the objective medical evidence.

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain

specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The provisions of 20 C.F.R. § 404.1529(c) set forth the following factors that the ALJ must consider in addition to the objective evidence when assessing a claimant's credibility:

1.   The individual's daily activities;
2.   The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.   Factors that precipitate or aggravate the symptoms;
4.   The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.   Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.   Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 or 20 minutes every hour, or sleeping on a board); and
7.   Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p.

When determining the credibility of a claimant's statements, the ALJ is not required to either accept or reject them. *Id.* The ALJ can find that that the claimant's statements are fully credible, partially credible, or incredible. *Id.* The ALJ can find that the claimant's statements are credible to a certain degree or that some allegations are credible and others are incredible. *Id.*

The ALJ found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC assessment. Tr. at 31. The ALJ recounted Plaintiff's

testimony.  *See* Tr. at 30–31.  However, he wrote that "[t]he claimant's subjective complaints to her physicians, the objective findings documented in her medical records, and the treatment she has required do not support a finding that her severe impairments prevent her from performing all work."  Tr. at 31.  The ALJ further indicated that Plaintiff's activities of daily living were "inconsistent with her allegations of such significant functional limitations . . . ."  *Id.*  He pointed to Plaintiff's abilities to drive, dress herself, shop for personal items, attend church occasionally, watch television, visit with family and friends, and reside in a home with a second-floor bedroom.  *Id.*  He indicated that Plaintiff had received conservative treatment for her back and had not required surgery.  *Id.*  He discussed physical findings of multiple physicians and objective test results.  Tr. at 31–33.  He discussed Plaintiff's complaints to her physicians and the information that she provided to them about her pain level and daily activities.  Tr. at 32–33.  The ALJ indicated that Plaintiff had "denied significant side effects to her pain management physician" and that Plaintiff's primary care physician's notes did not contain any reports of significant side effects from medications.   Tr. at 33.

The undersigned recommends a finding that the ALJ complied with the requirements of SSR 96-7p in assessing Plaintiff's credibility.  The ALJ considered Plaintiff's statements about symptoms with the rest of the relevant evidence, but concluded that Plaintiff's impairments were not significant enough to preclude her from performing all work.  While Plaintiff alleges that the ALJ ignored clinical abnormalities, the undersigned finds that this is incorrect because the ALJ considered those abnormalities in finding the restrictions that he indicated in Plaintiff's RFC.  *See* Tr. at

33.  Furthermore, the ALJ relied on much more than the objective medical evidence alone in finding that Plaintiff's testimony was not fully credible.

The ALJ explicitly considered Plaintiff's activities of daily living in accordance with SSR 96-7p.  *See* Tr. at 31.  He considered Plaintiff's activities of daily living as indicated in her testimony, in function reports, and in her physicians' reports.  *See* Tr. at 30–32.  Plaintiff directs the court to *Higginbotham v. Califano*, 617 F.2d 1058, 1060 (4th Cir. 1980), in which the Fourth Circuit indicated that "[t]he Secretary did not discharge his burden of proof that Higginbotham can do sedentary work by relying on the fact that she, at her own pace and in her own manner, can do her housework and shopping."  However, the undersigned notes that *Higginbotham* predates SSR 96-7p by many years and that the ALJ did not rely exclusively on his assessment of Plaintiff's daily activities in reaching a conclusion regarding her credibility.  Plaintiff's daily activities were but one of many factors considered by the ALJ in making the credibility determination.

The ALJ also explicitly considered the location, duration, frequency, and intensity of Plaintiff's pain as required by SSR 96-7p.  The ALJ discussed Plaintiff's indications to her physicians regarding her pain.  *See* Tr. at 32–33.  He noted that Plaintiff informed "Dr. Nolan in June 2009 that she was doing well with her pain until she overworked herself with housework."  Tr. at 32.  He also noted that Plaintiff reported receiving significant long term pain relief from lumbar transforaminal epidural injections.  Tr. at 33.

The ALJ considered factors that precipitate or aggravate the symptoms in accordance with SSR 96-7p. The ALJ specifically considered Plaintiff's chronic back, ankle, and knee pain when determining Plaintiff's RFC. *See* Tr. at 33.

The ALJ specifically considered Plaintiff's use of prescribed medications when assessing her credibility. Tr. at 33. However, he indicated that Plaintiff reported no side effects of medications to her physicians. *Id.*

The ALJ discussed the treatment Plaintiff received, including her use of epidural steroid injections and pain medication. Tr. at 31–33. However, the ALJ concluded that Plaintiff's treatment was conservative and that she had not required surgery. Tr. at 31.

The ALJ considered Plaintiff's testimony regarding the measures she used to relieve pain, including resting and elevating her feet. *See* Tr. at 30. However, the ALJ noted that her testimony was not consistent with the record. Tr. at 31.

While Plaintiff points to what she perceives as inconsistencies between her reported activities and the ALJ's findings, it is not within the scope of the undersigned's review to sort out inconsistencies in the facts, especially where those inconsistencies leave room for different interpretations. If the ALJ's interpretation of Plaintiff's reported activities were significantly divergent from the record, the undersigned could find that his conclusion was not supported by substantial evidence, but that was not the case here. Therefore, the undersigned recommends a finding that the ALJ adequately supported his decision regarding Plaintiff's credibility.

Plaintiff also argues that the ALJ erred in failing to consider her work history in assessing her credibility. Plaintiff points to *Steffanick v. Hegler*, 570 F. Supp. 420, 427

(D.C. Md. 1983), in which the court indicated that "[w]hen . . . a claimant has a substantial work record, his testimony as to pain should not be disregarded lightly." The undersigned finds it unnecessary to address Plaintiff's work history here because the undersigned finds that the ALJ followed the criteria set forth in SSR 96-7p in evaluating Plaintiff's credibility and thus did not disregard Plaintiff's testimony as to pain "lightly." As with the decision in *Higginbotham*, the decision in *Steffanick* predates SSR 96-7p. While the undersigned is not suggesting that these courts' findings are no longer good law, the undersigned acknowledges that the explicit purpose of SSR 96-7p is to clarify when the evaluation of symptoms requires a credibility finding; to explain the factors to be considered in assessing a claimant's credibility; and to state the importance of explaining the reasons for the credibility finding. The undersigned recommends a finding that where the ALJ complies with the requirements of SSR 96-7p and where his credibility finding is supported by substantial evidence, he has not lightly disregarded Plaintiff's credibility or testimony as to pain.

### 2.     Severe Impairments

Plaintiff argues that the ALJ erred in finding that osteonecrosis of the left foot, avascular necrosis of the right ankle, and depression were not severe impairments. [Entry #16 at 12]. Plaintiff argues that the ALJ erroneously found that Plaintiff had osteoarthritis of the ankles, but that Plaintiff has osteonecrosis in her entire left foot and avascular necrosis in her right ankle, which are much more severe impairments. [Entry #16 at 13]. Plaintiff argues that the ALJ based his conclusion that Plaintiff's depression

was not a severe impairment on a single note from Plaintiff's primary care physician and ignored evidence from Plaintiff's mental health provider.  [Entry #16 at 14–15].

The Commissioner argues that the ALJ properly identified Plaintiff's severe impairments.  [Entry #17 at 18].

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1508.  Determination of severity of claimant's impairment is "[a] de minimis hurdle in [the] disability determination process," meant to expedite just settlement of claims by "screening out totally groundless claims."  *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008).

A finding of a single severe impairment at step two of the sequential evaluation process is enough to ensure that the factfinder will progress to step three.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.").  Therefore, this court has found no reversible error where the ALJ does not find an impairment severe at step two provided that he considers that impairment in subsequent steps.  *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting

cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

a.    Osteonecrosis of the Left Foot

According to the U.S. National Library of Medicine, which is maintained by the National Institutes of Health, "[o]steonecrosis is bone death caused by poor blood supply." A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©1997–2014. Osteonecrosis; [updated 2013 Apr 24; cited 2014 Sept 17]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/007260.htm.[4]    In its early stages, osteonecrosis results in no symptoms. *Id.*    However, after bone damage worsens, symptoms may include joint pain that may increase over time and become severe if the bone collapses; pain at rest; limited range of motion; groin pain, if the hip joint is affected; and limping, if the lower extremities are involved. *Id.*    Non-surgical intervention may be able to slow the progression of osteonecrosis, but most individuals with the impairment eventually need surgery. *Id.*   "Advanced osteonecrosis can lead to osteoarthritis and permanent deceased mobility." *Id.*

Osteoarthritis, on the other hand, is a "common joint disorder" which is caused by the effects of aging and wear-and-tear on joints. A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©1997–2014. Osteoarthritis; [updated 2013 Aug 3; cited 2014 Sept 17]. Available from: http://www.nlm.nih.gov/ medlineplus/ency/article/000423.htm.    Symptoms of osteoarthritis include pain and

---

[4] A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (court may "properly take judicial notice of matters of public record").

stiffness in the joints, which cause the joints to become harder to move over time. *Id.* Osteoarthritis pain tends to increase after exercise and with weight bearing and pressure on the affected joint. *Id.*

The undersigned recommends a finding that the ALJ adequately considered Plaintiff's diagnosis of osteonecrosis. The undersigned's review of the relevant medical definitions reveals a clear distinction between osteonecrosis and osteoarthritis, and the undersigned's review of the record indicates that osteonecrosis was a confirmed and severe impairment. However, while the ALJ erred in failing to identify osteonecrosis as a severe impairment at step two, the ALJ considered osteonecrosis at subsequent steps, which rendered his error harmless. The ALJ specifically noted that Dr. Hartsock reviewed the claimant's MRI and x-rays of her left ankle and foot, diagnosed the claimant with osteonecrosis affecting multiple bones in her foot, but noted that x-rays were fairly unremarkable. Tr. at 32.

Plaintiff argues that the ALJ's misclassification of osteonecrosis as osteoarthritis caused him to underestimate the functional limitations imposed by Plaintiff's impairment. However, the undersigned's review of the record and consideration of the two impairments does not reveal this to be the case. Although "bone death" sounds worse than "wear-and-tear on joints," it does not mean that osteonecrosis is worse than osteoarthritis. In fact, the information set forth above reveals that osteonecrosis can be asymptomatic and does lead to osteoarthritis. Therefore, the ALJ's initial misclassification of the impairment did not lead him to assess lesser limitations than he would have assessed if he had classified the impairment correctly from the beginning.

32

The undersigned recommends a finding that the ALJ's assessment of Plaintiff's osteonecrosis was supported by the objective evidence in the record and that the ALJ adequately considered the limiting effects imposed by it when assessing Plaintiff's RFC. The ALJ found that Plaintiff's abilities to stand, walk, use the left lower extremity for foot controls, climb, and perform all other postural movements were significantly limited. Tr. at 30. This was consistent with Plaintiff's complaints of pain. However, a further assessment of limitations was not warranted where there was no evidence of bone collapse or limited range of motion.

b.     Avascular Necrosis of the Right Ankle

According to the National Institutes of Health, avascular necrosis is an alternative name for osteonecrosis. A.D.A.M. Medical Encyclopedia [Internet]. Atlanta (GA): A.D.A.M., Inc.; ©1997–2014. Osteonecrosis; [updated 2013 Apr 24; cited 2014 Sept 17]. Available from: http://www.nlm.nih.gov/medlineplus/ency/article/ 007260.htm.

For the reasons set forth above, the undersigned recommends a finding that, while the ALJ erroneously failed to identify avascular necrosis of the right ankle as a severe impairment at step two, his error was harmless because he subsequently discussed the impairment in subsequent steps. The ALJ noted that a MRI of Plaintiff's right ankle showed avascular necrosis in the right ankle and the distal tibia, talus, and calcaneus. Tr. at 32. However, he also noted that Dr. Hartsock observed that Plaintiff had full range of motion, only mild tenderness to palpation, no crepitation, normal strength and sensation, negative anterior drawer, and no arthritis. *Id.* These findings support the ALJ's RFC assessment.

c.    Depression

The ALJ indicated that "[b]ecause the claimant's medically determinable mental impairments caused no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, they were nonsevere."  Tr. at 28.

While Plaintiff alleges that she became disabled on November 8, 2008, the first indication of depression in the record was on June 17, 2009.  See Tr. at 437.  Plaintiff presented to Ms. Burke at Summerville Behavioral Health for an initial assessment because she was experiencing depressive symptoms following her mother's death and the recent relocation of her son and grandchild.  *Id.*  Plaintiff followed up with Ms. Burke on July 1, 2009, and reported that her symptoms had improved.  Tr. at 436.  Plaintiff reported no symptoms of depression for over a year.  She then reported to Dr. Deberry on October 20, 2010, that she was experiencing increased depressive symptoms.  Tr. at 365.  Plaintiff made similar complaints to Dr. Deberry on November 3 and 17, 2010.  Tr. at 361, 363.  However, by December 16, 2010, Dr. Deberry noted that Plaintiff's depression was stable.  Tr. at 360.  On February 23, 2011, Dr. Deberry completed a form in which she indicated that Plaintiff had no work-related limitations due to depression.  Tr. at 403.  On March 23, 2011, Dr. Deberry indicated that Plaintiff reported improving depression.  Tr. at 451.  Plaintiff saw Ms. Burke for the first time in nearly two years on May 19, 2011, and reported recurrent depression.  Tr. at 435.  She reported the same to Dr. Deberry the next day.  Tr. at 449.  However, the record contains no further complaints of depression in the one-year period between Dr. Deberry's May 20, 2011, note and the

May 23, 2012, hearing before the ALJ. In light of Plaintiff's infrequent complaints and treatment, the record does not suggest that depression significantly limited Plaintiff's mental ability to do basic work activities over the relevant period.

The ALJ specified that he based his conclusion on the opinions of three medical providers, one of whom was Plaintiff's primary care physician. *See* Tr. at 28, 34. In light of the evidence and the explanation provided by the ALJ, the undersigned recommends a finding that substantial evidence supports the ALJ's conclusion that depression was a non-severe impairment.

### 3. Obesity

Plaintiff argues that the ALJ failed to consider Plaintiff's obesity in accordance with SSR 02-1p. [Entry #16 at 16]. Plaintiff indicates that her weight increased by over 100 pounds between May 2009 and the date of the hearing. [Entry #16 at 16–17]. Plaintiff argues that, while the ALJ did list obesity as one of Plaintiff's severe impairments, he failed to explain what limitations it imposed in his RFC assessment. [Entry #16 at 18].

The Commissioner argues that the ALJ considered Plaintiff's obesity to be a severe impairment and explicitly stated that he considered SSR 02-1p. [Entry #17 at 20]. The Commissioner also indicates that the ALJ relied upon the opinion of a state agency consultant who explicitly discussed obesity in formulating Plaintiff's RFC. [Entry #17 at 21].

SSR 02-1p was enacted to provide guidance on Social Security's policy concerning the evaluation of obesity claims following the deletion of Listing 9.09,

Obesity.  SSR 02-1p.  The ALJ should consider obesity in determining whether the individual has a medically determinable impairment; whether the individual's impairment is severe; whether the individual's impairment meets or equals the requirements of an impairment in the Listings; and whether the individual's impairment prevents him from performing past relevant work or other work that exists in significant numbers in the national economy.  *Id.*

At step two of the sequential evaluation process, obesity is considered a severe impairment when it significantly limits an individual's physical or mental ability to perform basic work activities.  *Id.*

At step three of the sequential evaluation, the Commissioner will find that an individual with obesity meets the requirement of a Listing if he or she has another impairment that, by itself meets the requirements of a Listing or if the other impairment, in combination with obesity, meets the requirements of a Listing.  *Id.*  Obesity may also be considered medically equivalent to a Listing when it is at least equal in severity and duration to the criteria of a Listing.  *Id.  See also* 20 C.F.R. § 404.1526(a).  Medical equivalence may also be found if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a Listing, but the combination of impairments is equivalent in severity to a listed impairment.  *Id.*

At steps four and five, the Commissioner considers that obesity causes limitation of function and may affect a claimant's RFC and his ability to perform past work and other substantial gainful activity.  *Id.*  "[W]e will consider any functional limitations

resulting from the obesity in the RFC assessment" and "will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." *Id.*

When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

Plaintiff argues that SSR 02-1p requires that the ALJ explicitly state his or her conclusion regarding the effects of and functional limitations imposed by obesity in the RFC assessment. [Entry #18 at 7]. The Fourth Circuit has not addressed the level of specificity required in an ALJ's consideration of the functional limitations resulting from obesity and conclusion regarding the effects that obesity imposes on a claimant's RFC. However, in a case involving an ALJ's analysis very similar that that in the present case, *Coldiron v. Commissioner of Social Security*, 391 Fed Appx. 435, 443 (6th Cir. 2010),

37

the Sixth Circuit Court of Appeals found that where the ALJ discussed obesity multiple times throughout his findings of fact, concluded that obesity was a severe impairment, acknowledged that obesity contributed to the plaintiff's other medical conditions, and considered RFCs from physicians who explicitly accounted for the plaintiff's obesity, the ALJ had adequately accounted for the effect of obesity on the plaintiff's ability to perform work.

This court has held that the failure of an ALJ to address a claimant's obesity or its effects may be harmless error if the record does not reflect that obesity imposes any additional limitations on the claimant's ability to work.    *See Clark v. Astrue,* No. 8:11-2585-MGL-JDA, 2012 WL 6849874, at *10 (D.S.C. Dec. 14, 2012) (finding that the ALJ's decision with respect to the effects of the plaintiff's obesity was supported by substantial evidence where there was no evidence that the plaintiff's obesity produced exertional limitations beyond the RFC assessed by the ALJ); *Elder v. Astrue*, No. 3:09-2365, 2010 WL 3980105, at *9 (D.S.C. Oct. 8, 2010) ("As neither her medical records, nor her own statements provide [an explanation as to what effect] her obesity [had on her ability to work], any failure of the ALJ to explicitly address [claimant's] obesity is only harmless error."); *Gassaway v. Astrue*, No. 8:07-4083, 2009 WL 462704, at *10 (D.S.C. Feb. 23, 2009) (finding that there was no legal error in the ALJ's application of SSR 02-1p where the plaintiff offered no argument as to what limitations she would experience as a result of her obesity beyond that for which the ALJ already accounted).

The undersigned recommends a finding that the ALJ adequately considered Plaintiff's obesity.  The undersigned notes that there was no evidence that Plaintiff's

obesity produced exertional limitations beyond the RFC assessed by the ALJ, which would render any error on the part of the ALJ in considering Plaintiff's obesity to be harmless based on this court's precedent.  While Plaintiff alleged greater limitations than those found by the ALJ, she did not allege that those greater limitations were attributable to obesity.

The undersigned further recommends a finding that the ALJ addressed Plaintiff's obesity in accordance with SSR 02-1p.  The ALJ found that obesity was a severe impairment at step two.  Tr. at 27.  At step three, the ALJ specifically noted that he had considered SSR 02-1p and that he had considered Listings for musculoskeletal, respiratory, and cardiovascular body systems, but had concluded that obesity was not medically-equivalent to a listed impairment and that obesity in combination with another impairment did not meet or equal a Listing.  Tr. at 29.  While it would be a better practice for the ALJ to provide a specific statement as to how obesity was considered at steps four and five, the undersigned's review of the record as a whole reflects that the ALJ did consider obesity in determining Plaintiff's RFC.  The ALJ indicated that he considered the potential effects obesity had in causing or contributing to impairments in the musculoskeletal, respiratory, and cardiovascular body systems.  Tr. at 29.  The ALJ specifically noted that Plaintiff indicated in her testimony that she had "gained 100 pounds in the last two years because of her inability to move."  Tr. at 30.  The ALJ also noted that Dr. Hartsock indicated that weight loss may improve Plaintiff's foot and ankle pain.  Tr. at 32.  The ALJ specifically stated that his RFC finding was supported by Plaintiff's combination of impairments, including obesity.  Tr. at 33.  The ALJ also

indicated that he accorded great weight to the opinion rendered by state agency consultant Dr. Smolka, who specifically considered the effects of obesity on Plaintiff's other musculoskeletal impairments in determining her physical residual functional capacity. *See* Tr. at 34 referencing Tr. at 489. The record reflects that the ALJ determined that obesity, in combination with Plaintiff's other impairments, imposed limitations on her abilities to lift, carry, stand, walk, operate foot controls, climb, perform other postural movements, and be exposed to hazards. *See* Tr. at 30–34.

4. PRW and SSR 82-62

Plaintiff argues that the ALJ did not comply with the explicit requirements of SSR 82-62 ("SSR 82-62") in reaching the conclusion that Plaintiff could return to PRW. [Entry #16 at 18]. Plaintiff argues that the ALJ concluded that Plaintiff could perform PRW without considering the requirements of her PRW. [Entry #16 at 19]. Plaintiff argues that her testimony regarding the functional requirements of her PRW indicated that her actual duties exceeded the ALJ's RFC finding. *Id.*

The Commissioner argues that Plaintiff has the burden of proving that she was unable to perform her PRW. [Entry #17 at 22]. The Commissioner argues that because the ALJ relied upon the testimony of the vocational expert, who identified Plaintiff's PRW based on the exact DOT number and name, the ALJ's findings regarding Plaintiff's PRW were adequate. *Id.* Finally, the Commissioner argues that, even if Plaintiff could not return to her PRW as she performed it, the ALJ's conclusion that Plaintiff could perform her PRW as generally performed was supported by substantial evidence. *Id.*

SSR 82-62 was written "to state the policy and explain the procedures for determining a disability claimant's capacity to perform past relevant work (PRW) as set forth in the regulations, and to clarify the provisions so that they will be consistently applied." SSR 82-62.

To determine a claimant's ability to perform his or her PRW, the ALJ must consider (1) the claimant's statements regarding which requirements of past work cannot be met and his or her reasons for being unable to meet those requirements; (2) the medical evidence to the extent that it establishes limitations that affect the claimant's ability to meet the physical and mental demands of work; and (3) supplementary or corroborative information from other sources such as employers, the DOT, etc., on the requirements of the work as generally performed in the economy. *Id.*

If the ALJ finds that the claimant has the capacity to perform a past relevant job, the ALJ's decision must contain the following specific findings of fact:

1.  A finding of fact as to the claimant's RFC;
2.  A finding of fact as to the physical and mental demands of the claimant's PRW; and
3.  A finding of fact that the claimant's RFC would permit a return to his or her PRW.

*Id.*

The ALJ considered Plaintiff's statements and the medical evidence in determining her RFC. *See* Tr. at 30–34. In determining whether Plaintiff was able to perform her PRW, the ALJ considered the testimony of the vocational expert, who relied upon Plaintiff's statements and the job descriptions in the DOT. *See* Tr. at 34–35. The

ALJ concluded that Plaintiff was capable of performing her PRW as a dental receptionist. Tr. at 34.

The undersigned recommends a finding that the ALJ complied with the requirements of SSR 82-62 in concluding that Plaintiff's RFC allowed for the performance of her PRW. The ALJ's decision contains a finding of fact as to the claimant's RFC. *See* Tr. at 30. His decision contains a finding of fact as to the physical and mental demands of Plaintiff's PRW. *See* Tr. at 34. His decision also contains a finding of fact that Plaintiff's RFC would permit a return to her PRW. Tr. at 34–35.

While Plaintiff is correct that the ALJ erroneously concluded that she was able to perform PRW as actually performed, when Plaintiff's description of her past work in her testimony suggested that she could not, the undersigned recommends a finding that the ALJ's error was harmless. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding that where the ALJ conducted the proper analysis, cited substantial evidence to support his finding, and would have reached the same conclusion notwithstanding his initial error, the error was harmless). Because a claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work, the ALJ would have reached the same conclusion even if he had concluded that Plaintiff could not perform her PRW as actually performed. *See* SSR 82-62; 20 C.F.R. Subpart P, § 404.1520(a), (b).

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and

law.  Based on the foregoing, the undersigned recommends the Commissioner's decision

be affirmed.

IT IS SO RECOMMENDED.

September 22, 2014                                    Shiva V. Hodges
Columbia, South Carolina                      United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).